JOHN HURLEY v. DAVID KENNALLY, Appellant.

Division One, July 13, 1907.

**DEED OBTAINED THROUGH FRAUD: Undue Influence: Incapacity: Evidence.** Where an infirm and ignorant old man, who had recently lost his wife, induced by his loneliness and the proffered kindness of defendant, went to defendant's house to live, was there kept supplied with whiskey, and while sick conveyed land at the time worth three thousand six hundred dollars to defendant upon condition that defendant would clothe, support and maintain him during the remainder of his life, and there is evidence that he knew nothing about having made the deed until so informed by others, and that when it was made a lawyer and a notary appeared on the scene and they were liberally paid for their services and the deed was signed by his mark in their and defendant's presence alone, his hand being at the time held by the lawyer, and the evidence is contradictory of whether the lawyer and notary were sent for by defendant or brought by defendant at plaintiff's request, and that after the deed was made defendant by conversations with interested friends of plaintiff tried to conceal from them that a deed had been made, the finding of the chancellor that plaintiff at the time was mentally incapacitated from understanding the nature of said deed and that it was procured by the exercise of undue influence over him by defendant while he was in said condition of mind, will not be disturbed.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover,* Judge.

AFFIRMED.

*Bruce Barnett* for appellant.

(1) There was no evidence of mental incapacity. The only pretense or attempt at proof thereof was that defendant was old and sick, and that he had an hallucination that his deceased wife had sat by his bed in the same dress in which she was clothed when buried. This court has repeatedly held that neither of these facts is sufficient to establish mental incapacity. Cutler v. Zollinger, 117 Mo. 92; Studdard v. Wells, 120 Mo. 25; Cutts v. Young, 147 Mo. 587; Fitzpatrick v. Weber, 168 Mo. 562; Studybaker v. Cofield, 159 Mo. 597. (2) There was no evidence whatever of fraud or undue influence. The only thing of the kind pleaded in the petition or suggested by the evidence is that defendant furnished the plaintiff some whiskey, but there is no evidence whatever that he ever became intoxicated or his faculties clouded, or that he was under the influence of liquor at the time the deed was executed, or that he drank any liquor at all upon that day. There is no such inadequacy of consideration as to raise the presumption of fraud.

*Daniel B. Holmes* and *I. Tavenner* for respondent.

(1) The evidence fully justified the court in setting aside the deed. Dickson v. Kempinsky, 96 Mo. 258; Bispham's Prin. Eq. (6 Ed.), sec. 230; Fry v. Lane, 20 Ch. D. 322. (2) There is abundant evidence scattered all through the record that Kennally failed to carry out the provisions of the deed with respect to support, maintenance, etc. There is no pretense that since Hurley left Kennally's house the latter has ever given him but $2 or that he has even attempted in any way to provide him adequate support. There is nothing in the deed, even as it is written, that required Hurley to live with Kennally.

GRAVES, J.—Action by plaintiff instituted in March, 1902, to cancel a deed made by him to defend-

ant, February 12, 1902, conveying to said de-
fendant a small tract of land lying south of
Kansas City, estimated by plaintiff's witnesses
to be worth $3,600 at that time, and about twice
that sum at the date of trial. The deed is in
form a warranty deed, but contains as expressive of
the contract between them the following clause:

"It is a further consideration of this deed of con-
veyance that said David Kennally party of the second
part, shall support and clothe and maintain the said
John Hurley party of the first part, during the remain-
der of his natural life; shall provide him with neces-
sary medical attention and all other necessities, and up-
on his death give him a decent burial and pay all neces-
sary funeral expenses."

There is in addition an expressed consideration of
$350, although no actual money was paid at the time;
defendant, however, claimed previous advancements
in that sum.

This is the second appearance of the case in this
court. The first time, our views will be found in 186
Mo. 225. The merits of the case was not then passed
upon by us. The first trial, *nisi*, was before the late
Judge J. W. Henry, who first found for the defendant,
but upon a reconsideration of the case upon motion for
new trial he sustained the motion upon the ground, evi-
dently, as stated in our former opinion, that the judg-
ment was not sustained by the weight of the testimony.
After sustaining the motion and without further trial,
the court entered judgment for plaintiff, and this judg-
ment upon the appeal of defendant, was reversed, and
the cause remanded for trial *de novo*.

It was retried before Judge J. H. Slover and upon
that trial plaintiff was again successful, as evidenced
by the following judgment entered therein:

"Wherefore it is by the court ordered, adjudged
and decreed that said deed hereinbefore described from

plaintiff to defendant is null and void, and that the same and the record thereof be and the same are hereby set aside, canceled and for naught held, and that the possession of the said premises be restored by the defendant to the plaintiff; that there is due the defendant from the plaintiff the sum of one hundred and sixty dollars, together with interest thereon from and after this date at the rate of six per cent per annum, and that the defendant have a lien upon said land and premises for the payment thereof; and further that the plaintiff have a writ of restitution of said lands and premises, and have and recover of the defendant his costs herein most wrongfully expended, or incurred, and have hereof execution. And it is further ordered, adjudged and decreed that upon the payment of said sum of one hundred and sixty dollars and interest as aforesaid to the defendant, or into this court for the defendant, that the lien above declared on said lands and premises shall at once cease and terminate."

From this judgment the defendant duly appealed, after unsuccessful motion for new trial. We have a case of facts rather than one of law. The plaintiff, an aged Irishman, from the county of Cork, had been married about thirty-two years to his wife Ellen; for twenty four years prior to August, 1901, they had resided together in a little two-room cottage upon this small tract of land; the good wife, who was a neat housekeeper and an excellent cook, departed this life in August, 1901, leaving the plaintiff, then eighty-one years old, alone; they had no children, and no relatives, except some second cousins; after the ancient custom of the fatherland, a "wake" in usual and customary form was held, and the wife placed in her last resting place; mass under the rules of the church was said for her departed soul; the aged and decrepit husband, who knew nothing of cooking, returned to the desolate little home; through the kindness of neighbors he was furnished

with food for a few days and in the meantime he met
the defendant, likewise from the Emerald Isle, but
from the adjoining county of Limerick; the meeting
was at a barber shop in Kansas City, and is described
thus by plaintiff:

"Q. When did you first see Mr. Kennally after
your wife's death? A. I seen him in town. I went into
a barber shop to shave and Kennally was peddling his
milk around town somewhere and happened to come in
there. He seen my horse in the street; he come in and
said, 'You never cooked in your life; come up to my
house and I will cook for you. Live with me for a
while.' That is how it was.

"Q. Well, what did you tell him? A. I told him
I would. Told him to send my furniture up there. I
told him I would, and I sent the furniture up there.

"Q. Did you ask him to let you come to his place,
or did he invite you up there? A. He invited me up
there."

And thus by defendant:

"Q. What did he say about his circumstances?
A. He said he was living down there by himself. I
asked him who gave him anything to eat. He said Mr.
Young gave him something to eat. 'Why,' I says, 'you
could come up to my house, John,' said I, 'and I will
give you something to eat.' 'I know you couldn't cook
or do anything for yourself, and whenever you want
anything, come up to my house.' That was all.

"Q. What did he say to that? Did he make any
reply to that, that you remember? A. I believe that
he said that he would. I said, 'You mustn't get hungry
down there; when Mr. Young gets tired of cooking or
giving you anything, come up to my house.' I said,
'You know you couldn't cook or do anything for your-
self, or make a cup of coffee, but I can do it and you
mustn't get hungry,' was all.

"Q. That was all that was said there that day?
A. That was all."

Defendant is and was an old bachelor, aged at the
time 60 years, and ran a dairy near where plaintiff
lived; he had living with him an aged Teuton, Solon
Shackett, by name; they kept house themselves, except
once or twice a week a woman relative of the defendant
came over and did some cooking and house-cleaning;
the evidence is contradictory as to the cleanliness of
the place.

It also appears that defendant was much affected
by the death of his wife. Defendant, in further detail-
ing the barber shop incident, says:

"Q. Did he cry on that occasion? A. Well, yes,
we both cried. We both chimed in. Mrs. Hurley was
an old friend of mine.

"Q. You both cried on that occasion? A. Yes, sir.

"Q. You next saw him at his house some two
weeks afterwards? A. Yes, sir.

"Q. And then he cried again? A. Indeed he did.
He was so glad for me coming—'Why didn't I come be-
fore this,' he said."

Shortly after this meeting the plaintiff had a Mr.
Young haul over some of his furniture, and after about
two weeks, defendant went over after the plaintiff, and
he describes the incident thus:

"A. I found the poor old man lying right there on
a mattress on the floor, and when I went in I said,
'My God, John, this house is so bare.' And, 'Davie,'
he said, 'is the only friend I have got on earth—why
didn't you come long ago?' And he commenced to
cry and he sat upon the chair. Well, he says, 'I feel re-
lieved now, and my mind is easy.' And then he com-
menced telling me about mashing his bones and killing
him, and Tom Hurley was going to kill him about the
$75 that his mother stole, and some things his wife had;
I said, 'You can be easy—you know Mrs. Hurley has

got enough besides that.' I says, 'It won't be long—it won't be very long until the others are lying in the same condition,' I said. He sat up then, and Mr. Stewart came over—

"Q. That is the old gentleman that got sick here yesterday? A. That got sick. And he said to Mr. Stewart, 'I am satisfied now—I can get one night's rest where I will be protected and I won't be afraid of my life.'

"Q. Then he went up to your house? A. We put the mattress in the wagon and Mr. Stewart got old John Hurley in the milk wagon, with his head up towards where I was and his feet down to the back end of the wagon on a board, his feet were hanging out, down upon the mattress, and I brought him home."

This removal of plaintiff was about September 1st, or a little later perhaps. It should be noted that plaintiff and defendant had been acquainted for some years, and that both were of the same religious faith. Plaintiff seems to have had an appetite just a little partial to the taste of "red liquor" and especially if it was flavored with rock candy. Immediately upon the arrival of plaintiff at defendant's home, it would seem that whiskey was made a substantial portion of the old man's diet. Speaking of the plaintiff's condition and treatment immediately after his arrival, the old German says:

"Q. Why did he think he would die? A. I thought myself that he would die in about three or four days.

"Q. When he first came there? A. When he first came there.

"Q. He looked feeble? A. He looked feeble, and Dave took right good care of him.

"Q. He looked feeble and broken-hearted? A. Broken-hearted.

"Q. Well, then, while he was there I suppose he

had Dave furnish him with all the whiskey he wanted?
A. Yes sir.

"Q. How much did Dave furnish him? A. Well,
I believe they used to get half a gallon a week, I be-
lieve, or a gallon; I don't know.

"Q. Or a gallon? A. I don't know.

"Mr. Buckner: Oh, he didn't say so.

"Q. Sometimes you think they had a gallon, do
you know? A. No, it might be a gallon or two gallons;
I don't know. It was one of them big—

"Q. (Interrupting): One of those big demi-
johns? A. Yes, sir.

"Q. And all you fellows helped yourselves more
or less? A. No, sir. Sometimes Mr. Hurley or Dave
gave me a drink when they wanted to; and sometimes
they wanted to give me more, and I told them no.

"Q. The whiskey was for John Hurley, was it?
A. Yes, sir."

Upon this point, defendant says:

"Q. How much whiskey did you furnish Mr. Hur-
ley during the time that he was there? A. Lord, I
couldn't tell you now—it has been so long since.

"Q. How much a week—a half a gallon a week?
A. Perhaps maybe an old demijohn, or maybe some-
thing more. I couldn't exactly tell you."

Shortly after reaching the home of the defendant,
the plaintiff began to visit Matilda Kelley and her
brother, two aged persons of the same nationality.
These visits were frequent, whether induced by the
companionship of the Kelleys or a nearby saloon is not
quite clear to our minds. It is clear he would return
at times feeling a little worse from visits to the wayside
saloon. The result was a deed to the Kelleys for four
acres of the ground, without consideration. The latter
part of January, the plaintiff took a severe cold and
was confined to his room and bed, quite sick. During

206 Sup—19

this illness, on February 12th, 1902, a lawyer and notary public appeared, with the deed already prepared, and it was executed by the mark of plaintiff being placed thereto under the guiding hand of the lawyer and in the presence of defendant, the lawyer and the notary. After the execution of the instrument, the three, plaintiff being left out, joined in taking a drink from a bottle of whiskey in plaintiff's room, whereupon defendant paid the lawyer ten dollars and the notary two dollars. It is a matter of dispute as to how these parties happened to come. Plaintiff says that he did not send for them, and the defendant says that he brought them there at the request of the plaintiff. There is also a discrepancy in the testimony of the defendant's witnesses as to how the lawyer and notary got there. The wife of the deceased lawyer says that they sent a carriage to the house for her husband, while the notary says that he and the lawyer took the street car from the office and went to the end of the car line, and was then taken by defendant's rig to the house. The defendant's testimony corroborates the notary. A discussion as to the reason for this difference is unnecessary, but may be inferred from the charges in the petition. The estimable lady witness said: "I have no feeling one way or the other, except my husband's name." But sufficient upon this point. According to defendant, when the deed was drawn, the attorney said to the aged, decrepit and sick old man, as he lay propped up in bed: "John, this is the honestest deed I have drawn between two parties." If this really occurred, it strikes us as a very singular remark. If it occurred, which we doubt, it would indicate much. To our mind it was not said, but is used by the witness as a self-conceived shield, for what he at least realized to have been an over-reaching and dishonest transaction. From one witness, the following was shown as

to what defendant thought of plaintiff's condition at about the time of making the deed:

"Q. What did he say about how sick Mr. Hurley was? A. Well, he said he was real sick—he said, once or twice, two or three nights he said he thought John was going to die—and he had nursed him and been up at night making a fire and every thing, but now he said he was better.

"Q. State what, if anything, he said about being protected for looking after Hurley? A. He said he had all this trouble and all this care, but he didn't tell me anything about John having given him the farm, but he just said, 'How will I be protected, May Murphy —I have had all this care and trouble—how will I be protected, May Murphy?' "

This conversation was after the defendant had the deed and he practically admitted the conversation.

The details of all the evidence in this record will serve no good purpose. Suffice it to say that it appears for the plaintiff, who can neither read nor write, that while very sick he signed a paper at the request of defendant and his attorney; that he did not know what he was doing at the time; that he did not know that he had made a deed for some days afterward when he was informed by some lady relative who visited him; that when informed that he had made a deed to all the property he had, he said that he had made no deed; this was several days after the deed was recorded on February 13th; that he was then sick and when he was asked what he would now do for a tombstone for his wife, said that his wife was not dead, for he had talked with her the night before; that his wife sat in a rocking chair in the room and talked to him; the old German said, before making the deed, he talked about seeing his wife at night; to others a few days after the deed was made and before he recovered from his sickness, he said

that he talked with his wife every night. All goers and comers found whiskey in his room.

On the other hand the evidence is that the deed was read to plaintiff; that he was glad the lawyer had brought it; that he had been wanting it done for some time; that he did not want his relatives to have his property; that he had directed the deed made in September before; that he was not very sick at the time the deed was made and understood what he was doing; that he had said all along that he wanted defendant to have the land for keeping him.

It also appears that at one time several real estate men called upon plaintiff to see what he would take for his land, and that it seemed to anger defendant, who treated them rudely and talked to them offensively. The plaintiff says, and it was borne out by the circumstances, that when he was informed that they had gotten him to make a deed, as soon as he was able, he left defendant's place and had never returned. He claims that he asked for a doctor and a priest while he was sick, but defendant brought a lawyer instead. These matters are denied by defendant. We will not go further into detail. Suffice it to say that we have gone over all the evidence in the case and feel satisfied with the conclusion reached by the learned chancellor who presided at the trial in the lower court.

In his findings, speaking of this deed, he says: It "was by the defendant fraudulently procured to be made to him by the plaintiff at a time when plaintiff was feeble in mind and mentally incapacitated from understanding the nature of said deed and by the exercise of undue influence by the defendant over the plaintiff while he was in said condition of mind; that the defendant has not kept and did not intend to keep, the covenants on his part implied by the acceptance of said deed; and that said deed is null and void and ought to be set aside."

The chancellor then takes an accounting between the parties, which resulted in the $160 mentioned in the judgment proper.

To our mind the weight of the testimony sustains the findings and judgment of the lower court, and such judgment is affirmed.

All concur.